John Carroll Young, J.
The above claims which arose out of an accident which occurred on November 3,1964 and allegedly caused by negligence of the State of New York, were duly and timely filed.
On November 3, 1964, the above-named Max W. Harvey, now deceased, was an employee of claimant Gene Adams Refrigerated Trucking Service, Inc., for which corporation he had been employed about 12 years; the proof showed that he was thorough and efficient and that his work habits were “ ideal ”.
On said date at about 11:00 p.m., he was operating a tractor trailer owned by said corporation and upon its business, in an easterly direction on the New York State Thruway between the City of Buffalo and the City of Syracuse, N. Y. Except for the existence of a combination of smoke and fog, hereinafter referred to as “ smog ”, which existed at the location hereinafter mentioned, the weather was clear; the pavement was dry.
The proof showed that in the area of the so-called Montezuma Swamp through which the Thruway extends and approximately in the area between mileposts 313, 314, 315 and 316 (the mileposts being numbered upward from east to west, milepost 316 was furtherest west) there had existed at various points from time to time for a period of about two weeks prior to November 3, 1964, a mixture of smoke and heavy fog called a “ smog ” condition which at times had been so severe and the smog so dense that on Saturday, October 17,1964, maintenance men were called out at 9:30 p.m. to set out pot flares between mileposts 316 and 312; at first these flares were set out spaced at various distances along the shoulder of the highway, but this proved to be an unsafe practice; thereafter, a system was adopted whereby the flares were set out in clear areas preceding the smog areas.
On Sunday, October 18,1964, at milepost 314.4, the smog was so dense that a maintenance truck operated by Thruway employees sent out to ‘ ‘ patrol ’ ’ the smog area and to set out warning flares, at 2:30 a.m. had collided at milepost 314:4 with another vehicle, striking the car in the rear.
Considerable proof was introduced from the work records or maintenance diary of the New York State Thruway and the testimony of the supervisor of the section of the Thruway in *1081 which the accident out of which this claim arose occurred, showing the extent and nature of the efforts made by the maintenance workers to protect the persons traveling on the Thruway from the dangers presented by the smog condition; this proof showed that periodically over more than two weeks prior to November 3, 1964, smog conditions existed from time to time wherein the visibility on the Thruway between mileposts 313 and 316 was practically zero, enveloping the area in banks of smog, with alternately clear areas intervening between impenetrable clouds, wherein any objects more than three feet distant were indiscernible; the proof also showed that these maintennance men and those in supervisory capacity were called out at night at various times while off duty and at their homes, to perform such work. Their procedure was to place the pot flares when needed and to remove them as soon as the smog dissipated and the need for them ended.
Although there were periods of time when no smog was present, the condition had 'become so commonplace that on November 2,1964 two refleetorized warning signs each four feet high and six feet wide, suspended on “A” type frames, were placed across from each other facing eastbound traffic on each side of the eastbound lanes about at milepost 316.7, one on the south shoulder of the eastbound driving lane and one on the mall to the left of the eastbound passing lane. The legend on each sign which read in capital letters:
REDUCE SPEED
SMOG AHEAD
consisted of white letters on refleetorized plywood, the letters in the words “ REDUCE SPEED ” being six inches high and the letters in the words “ SMOG AHEAD ” being 10 inches high; in front of and beneath each sign were placed foyr kerosene pot flares.
However, these signs facing eastbound traffic placed at- milepost 316.7 were located two miles west of the point where the accident occurred and in this intervening distance of two miles no warning of any kind whatsoever was posted or located.
A pair of similar signs facing westbound traffic was placed on both sides of the westbound lanes at milepost 312.4.
On November 3, 1964, the day of this accident, which was election day, only one maintenance man was on regular maintenance patrol in the area and this was only from 6:30 a.m. to 10:30 a.m., no other maintenance man was on duty all that day *1082 from 10:30 a.m. until the accident occurred which was approximately 11:00 p.m.
Said Max W. Harvey had left Buffalo at about 8:00 p.m. on November 3, 1964 to make the run to Syracuse, intending to make the return trip to Buffalo and to arrive back at his home in Tonawanda, New York about 8:00 a.m. on November 4, 1964. He had operated this same ‘ ‘ run ’ ’ from Buffalo to Syracuse and return daily or nightly Monday through Friday for about five years immediately prior to November 3, 1964.
Claimant produced as a witness one Leffingwell, who testified that he was driving a tractor trailer outfit easterly on the Thruway on the night of November 3, 1964 and that at a point approximately 10 to 15 miles west of milepost 314, he passed the tractor trailer operated by Mr. Harvey, which was also proceeding in the same direction, and that Mr. Harvey was then operating at a speed of about 55 to 60 miles per hour; the maximum lawful speed was 65 miles per hour. Another witness, one Kessler, the owner and operator of another eastbound tractor trailer outfit and also produced as a witness by claimant, stated that at a point about 3/5 of a mile west of milepost 316, Mr. Harvey’s outfit passed him at a speed which he estimated at 60 miles per hour. From a certain photograph received in evidence herein, Mr. Kessler was able to state that the point where Harvey passed him was a short distance east of where the two signs facing eastbound traffic and bearing the message “REDUCE SPEED SMOG AHEAD ” are shown in this exhibit. Kessler testified, however, that on the night in question he did not observe the signs that are shown in this photograph.
From the testimony of Leffingwell, it appears that after observing the signs, he reduced his speed to about 40 miles per hour and after encountering the smog he reduced his speed to about five miles per hour; that the smog was so impenetrable he was able to drive his tractor trailer only by thrusting his head out of the window of his tractor and guiding it by its relation to the white lines painted on the pavement. This witness stated that after proceeding in this manner a distance which he estimated as about half a mile, he had just withdrawn his head into his cab when his trailer was struck in the rear by the tractor trailer outfit operated by Mr. Harvey, with such force as to demolish the tractor driven by Mr. Harvey, to cause substantial damage to the couplings between it and its trailer, and to damage the Leffingwell equipment forcing it ahead and causing it to “ jackknife ” partially off the right side of the eastbound driving lane of the Thruway.
*1083 Concerning the distance he had driven into the dense smog, before being struck by the Harvey outfit, the testimony of Leffingwell is at variance with the testimony of claimant’s witness Kessler, who stated that after Harvey passed him, he continued to follow the Harvey equipment and, after driving a distance of about two miles, without encountering any smog, he observed the stoplights of the Harvey equipment go on, and “ just at the same moment ” he observed the smog ahead; that the Harvey outfit disappeared in the smog; that he, Kessler, then about 150 feet behind, applied his brakes, entered the smog and was slowing down when 'almost immediately the right tire “ blew ” on his tractor, and he “hit the emergency stop ” and “ stopped dead”; that he put his four-way flashers on and leaped from his truck to place emergency flares out to warn oncoming traffic of the presence of his truck standing on the highway; that at this time the smog was so thick that Kessler could not see beyond his own headlights and in going to the rear of his trailer to place the flares, was guided by the lights along the side of the trailer.
Through the smog, he heard the voices of some motorists whose automobile was on the dividing mall and off the traveled portion of the highway; fearing some vehicle would approach and in trying to avoid striking his tractor trailer, might collide with their car, he called to them and by following their answering voices, was able to reach their car and assist in driving it to a safer position off the pavement and to the right side of his own equipment; it was not until after he had completed this repositioning of their car that Kessler learned from the driver of the tractor trailer with which Harvey had collided that the wrecked Harvey trailer was standing on the highway a few feet from the front of the Kessler tractor and that fortunately, although unknowingly, he had brought his tractor trailer to. a stop at a distance which he estimated to be only about five feet from the rear of the Harvey trailer.
The density of the smog was also described by certain State Police officers called as witnesses, who established that the visibility was virtually zero.
If the court was satisfied that Mr. Harvey had continued to drive Ms tractor trailer at a high rate of speed for half a mile into this thick smog, the court would be required to find and conclude that he was guilty of contributory negligence which would prevent any recovery herein by either his administratrix or by his employer.
However, the court does not find that he did so operate his veMele; since it is undisputed that in the location where the *1084 Harvey accident occurred, the smog was so dense that the visibility was actually zero, it is unreasonable to conclude that Mr. Harvey would or could have driven blindly for a half mile through such an impenetrable smog and keep his vehicle on the traveled portion of the highway, and the court finds that he attempted to slow or to stop his vehicle as soon as he saw the smog. The proof indicated that at times there were portions of the area where there was no smog and where the visibility was normal; this appears to have been the condition immediately west of the portion of smog through which Leffingwell was slowly proceeding; the witness Kessler stated that as his vehicle and the Harvey vehicle proceeded along the highway immediately before he observed the smog, no obstruction to vision existed, but at the point where the Harvey vehicle and his encountered the smog, it “ actually rolled across the highway at us ”.
The claimants submitted expert testimony to the effect that the warning afforded by the two signs placed at the one point opposite each other on both sides of the eastbound lane was inadequate to advise motorists of the smog condition existing about two miles east of the signs and that proper warning on a high speed unlighted highway such as the Thruway was at the point of this accident, required among other measures the placing of consecutive warning signs to keep motorists advised as they approach the section where dense fog existed, the placing -of kerosene pot flares at stated intervals through such dense areas, and maintenance men to attend to such warning facilities, and under conditions such as prevailed at the point of this accident, the Thruway should either have been closed or vehicles convoyed by police escort through the danger area.
Upon all of»the evidence herein, the court finds and concludes that the State of New York and the New York State Thruway Authority, under all the facts and circumstances existing at and prior to the time of this accident, were guilty of negligence which was the proximate cause of the accident out of which these claims arose and of the resulting loss and damage sustained by the claimants herein, and that the State and said Thruway Authority have failed to sustain the burden of proving that Max W. Harvey, deceased, was guilty of any negligence contributing thereto.
At the date of his death Max W. Harvey, claimant’s intestate, was between 54 and 55 years of age and, according to certain life tables of which claimant asked the court to take judicial notice, had an average life expectancy of 19.82 years.
The court finds that claimant Georgia E. Harvey, as administratrix of the estate of Max W. Harvey, deceased, is entitled to *1085 an award herein in the amount of $85,876.95, representing $85,000 for the wrongful death of said decedent, $851.95 for his reasonable funeral expenses and $25 for the physician’s bill for professional services rendered decedent immediately following said accident, together with interest thereon from November 3, 1964 to date of entry of judgment.
The court finds that claimant Gene Adams Refrigerated Trucking Service, Inc., is entitled to an award herein in the amount .of $10,278.33, with interest thereon from November 3, 1964 to date of entry of judgment, said sum of $10,278.33 representing the following items of loss or damages sustained as a result of said accident, viz.: 1959 Brockway Tractor $6,800; 1950 Trailmobile Trailer $2,100; towing charges $603.50; amounts paid for cargo lost $274.83; extra services of employees required by reason of this accident $500.
Although the court has found that claimant Gene Adams Refrigerated Trucking Service, Inc., paid the amount of $1,483.20 for rental of a tractor trailer unit for 15 days after said accident, no part of said claim for $1,483.20 for such rental is allowed.