Milton Alpert, J.
Claimant’s intestate, Rudolf M. Ritter, set out for work on the morning of November 26, 1969 as he had been doing regularly for about four years and since he moved tó Poughquag in Dutchess County, which is located east of Poughkeepsie. Part of his traveling route in going to work was to proceed westerly along State Highway Route 55 as it went generally in an east-west direction in the Town of La Grange in Dutchess County; he returned from work by traveling easterly along such route. Mr. Ritter operated a 1964 Chevrolet Corvair sedan.
About 180± feet east of the intersection of Ed Hunt Road with Route 55, Route 55 curves toward the left as one travels westerly and goes slightly downgrade around the curve.
Claimant alleges that as Mr. Ritter reached a point about 180± feet east of the Ed Hunt Road intersection, and at about 7:30 a.m., Mr. Ritter’s car was caused to skid by reason of an *81 icy condition on the road. The car skidded into the eastbound lane where it came in contact with an automobile traveling eastward. As a result of the collision, Mr. Bitter lost his life.
Claimant, who was appointed administratrix of the. estate of Rudolf M. Ritter by order of the Surrogate of Dutchess County, alleges that the accident was caused by the negligence of the State in the manner in which it maintained Route 55 and by the failure of the State properly to salt and sand the existing icy conditions or to warn the traveling public of the road conditions. Claimant seeks substantial damages for the alleged wrongful death of Rudolf M. Ritter. The claim, which was timely filed, has not been assigned or submitted to any other court or tribunal for determination.
At the trial, State Trooper Jerry O’Hearn testified that he and Trooper Simard were on the 11:00 p.m. November 25 to 7:45 a.m. November 26 tour of duty, that they were assigned to Troop K, Dover Plains, with general patrol duties, that they were notified by radio between 5:45 and 6:00 a.m. on the morning of November 26 of an accident (not the accident involved in the instant claim) on Route 55 in the Town of La "Grange at which time they were on Route 22 in the Town of Amenia some 20 miles away, that they proceeded to the scene of the accident traveling south on Route 22, west on Route 343, south on Route 82 and west on Route 55 to the .scene of the accident, that there was a light rain at the time, that the condition of the roads was icy, that he had called in by radio to ask for sanders to sand numerous icy conditions, including the area of the accident, that the condition of the road was icy when he arrived at the crossing of Routes 82 and 55, that they arrived at the scene of the accident on Route 55 which was 1,000 to 1,500 feet west of the crossing of Routes 82 and 55, that they arrived at about 6:30 a.m. and found two cars on the right or westbound side of the highway partially on and off of the westbound traffic lane, that there were flares east and west of the scene of the accident on the shoulders of the highway, that these flares were fuse railroad type flares which burn about 20 minutes, that Zone Sergeant Spiro was there from the Fishkill State Police station, that he had called for an ambulance, a tow truck and sanders, that the accident in question was along so-called Hunt’s Curve on Route 55, that he proceeded to see to the injured, while Trooper Simard put out more flares — again, these were the fuse railroad 20-minute type which were put out both to the east and west of the accident scene — that the two cars involved in the accident were towed away, and that he and Trooper Simard left the scene of this *82 accident between 6:45 and 7:00 a.m., that the condition of the highway surface was still icy when he left, that it was the procedure for troopers when general icy conditions existed to place flares on either side of the scene of an accident and to main- , tain them until the cars involved were removed and that it was not the procedure when general icy conditions existed to police any particular area by having warning flares or personal attention given at either end of a particular icy area, that both cars involved in that accident had been traveling west. On cross-examination, he testified that it had been raining very lightly, that all roads that he had traveled on from the time of the radio call to his arrival at the scene of such accident were icy, that he first noticed the icy conditions when he received the radio call to respond while on Route 22 in the Town of Amenia, that in the general area of the scene of the accident there were numerous hills and valleys along the highway routes. This included Route 55 east of its crossing with Route 82 and also from such crossing toward Route 22.
Edward J. Meyer, the highway light-maintenance foreman employed by the State Department of Transportation, whose responsibility relates to the maintenance of the surfaces of highways, testified that on the morning of November 26 he received a telephone call at approximately 6:30 in the morning concerning the above-described accident on an icy spot at Hunt’s Curve on Route 55, that he requested his wife to call out his men and to tell them to meet him at the Department of Transportation substation which was along Route 82 just north of the crossing of such route with Route 55, that they met at 7:10 in the morning and that he had the sander ready to go at that time, that he began to sand by going north on Route 82 some 500 feet and then south on Route 82 to the place where it crosses with Route 55, then he went east on Route 55 about 500 feet where there was a hill and then turned around and went west on Route 55 through the crossing with Route 82 and then westerly along i Bbute 55, that there were some wet spots as well as icy spots and that he did not sand the wet spots, that when they began to approach Hunt’s Curve it was wet and then icy and that he began to sand the westbound lane in which he was traveling (this was about 7:20 in the morning), that he saw an accident in front of him about 500 feet from where he started to sand (which was the accident involved in the instant claim), that there were cars on both the right hand side and left hand side of the road, that he was asked by a tow truck operator to call the ambulance, that there were no State policemen present when *83 he came through, that he had no recollection of seeing burning flares in the area, that he continued through the scene of the accident to sand about another 500 feet to the west, that he then stopped sanding because the road was clear ahead, that he then turned around and headed- east on the eastbound lane, that he did not sand going east, that there were no warning signs on either side of Hunt’s Curve to the effect that the curve was dangerous or slippery or icy, but that there was a left hand curve sign about 700 feet east of the scene of the accident for westbound traffic, that there were some areas that had to be sanded more often than others, and that Hunt’s -Curve was one of these areas.
On cross-examination, Mr. Meyer testified that he arrived at the substation between 6:50 and 6:55 a.m., that his truck was facing Route 82, tha.t as he looked out he saw a vehicle on its side on a bank which was 500 to 600 feet north of him on the other side or northbound lane of Route 82, that it was icy on Route 82 north of where he was, that he started sanding by going north on Route 82 and past the overturned car and proceeded some 500 feet, that he then turned and came back on the southbound lane of Route 82, then because there was a hill on Route 55 east of the Route 82 and 55 crossing that he went up that hill and sanded, that it was icy there, that he sanded some 500 feet up the hill and then turned around and came down and continued east to the scene of the accident in which Mr. Ritter and others were involved. He testified that some areas iced up sooner than others such as hills, curves and bridges, and that his instructions were to hit those areas first, that after returning from Hunt’s Curve, he went back for another load of sanding material and sanded other areas and bridges until after 8:00 a.m. when he finished, that as time went on that morning, more areas were beginning to be wet because the temperature was turning warmer.
Trooper Henry H. Hommes testified that at the time of the accident he was assigned to Troop K, Dover Plains, and on November 26, 1969 had a tour of duty commencing at 7:00 a.m. with general patrol duties, that at 7:30 a.m. while he was on Route 82 in the Town of La Grange he received a call concerning accidents on Route 55 west of its juncture with Route 82, that at that time, he was about three miles away from the scene of the accident, that he arrived at the scene of the accidents at 7:35 a.m., that in his travels to the scene of the accident the road was not icy but wet, that in the area of the curve it had been sanded by the time he arrived, that when he arrived three cars had been in accidents — one was along the north side against *84 guide rails and two were along the south side with their fronts facing into the high embankment on that side, that one of the latter two cars was the car which Mr. Bitter had been driving, that when he got to the scene Trooper Finn, who happened to have come by, but was not on duty, was there and that as a result of his inquiries, he had been informed that the car along the north side of the highway had been in its accident about 7:15 a.m. and that the Bitter car had been in an accident at about 7:30 a.m.— however, with respect to the latter, he stated that Trooper Finn had called at 7:25 a.m. to report the latter accidents and that, accordingly, the accident involving the Bitter car had probably happened before 7:25 a.m., that he had been told in making his investigation that before Hunt’s Curve was sanded its surface was icy.
On cross-examination, Trooper Hommes testified that he was called to investigate yet another accident. This one was on Boute 82 north with its intersection Boute 55 where a car had turned over. He stated that he had been informed that this accident had happened at 6:45 a.m., that by the time he investigated this accident the car had been removed.
Lenson Frank Fells, an owner of Lenny’s Service Station in the Town of La Grange, testified that his service station engages in towing operations, that such station is located approximately three miles west of Hunt’s Curve, that in the morning of November 26 he was called to respond to a two-car accident before 7:00 a.m. that morning, that he and his father each drove a wrecker from their home to the scene, that conditions on Boute 55 prior to arriving at the curve — coming from the West— were wet and moist but not freezing, that there was a drizzle falling, that it was icy when they arrived at Hunt’s Curve, that he and his father each picked up a car from Hunt’s Curve, that at that time there were flares there, that he also placed some 30-minute flares around the scene of the accident, that he and his father were at the scene of the accident approximately one-half hour when - they left with both cars in tow, that the curve was icy when they Ifeft, that when he arrived at his yard three miles to the west he received a radio call of an accident at the crossing of Boute 55 and 82; namely, that a car had turned over, that at this time it was a little after 7:00 a.m., that he .unhooked the car he had been towing and headed back toward Hunt’s Curve and the crossing of Boute 55 with 82 further to the east, that a mist was coming down and that the highway was wet, that it became icy toward the curve, that there were two cars in front of him traveling east, that the car second *85 ahead of him was operated by a person — namely, Riccobono ■ — ■ that all three cars — the Riccobono car, the car in the middle, and his tow truck, were going about 30 to 35 miles per hour, that when they arrived in the area of Hunt’s Curve there was one car to the left of him on the north side against the guide rails (the Avezzano car) and that he then observed a car coming from the east toward him, that that car spun completely around on the ice and then drifted toward the eastbound lane and that such car and the Riccobono car came into collision with both cars then hitting the high embankment on the south side of the highway, that the Ritter car was the car which was eastbound and which went into a slow spin and then slid sideways down into the eastbound lane, that he called his service station by radio as the accident was happening and then for an ambulance, that the driver of the Riccobono car tried to avoid the accident by veering to the right but that the Ritter car drifted or slid down and hit it, that the road was a glare of ice in the area, that the sander came by after the Ritter-Riccobono accident happened, that he called his father to bring the other tow truck, that they towed both the Riccobono and Ritter cars away, that they were there at the scene for about an hour, that the highway was not icy when they left, that it was his observation that the area of the curve was a cold spot in the fall and spring, that it freezes even though other areas nearby do not, and that it becomes a sheet of ice there.
On cross-examination, he testified that while he was at the scene of the Ritter-Riccobono accident someone came by to say that the overturned car for which he had been called was on Route 82 north of its crossing with Route 55, that he estimated that the Riccobono car was five lengths in front of him and that when the Ritter car began to spin some 200 feet in front of him — thus the Riccobono car was about 100 feet in front of him — that Riccobono’s car had not stopped when the impact occurred with the Ritter car.
Patrick J. Maloney, an Associate Civil Engineer, employed by the State Department of Transportation with responsibilities in highway design, testified that Route 55 was constructed in 1931 in accordance with approved plans and then good engineering practice, that it was widened and repaved in 1952 in accordance with approved' plans and then good engineering practice, that those who approved the plans were all professional engineers, that the area was not called to his attention with respect to the placing of any particular types of signs, \ that he did not have general responsibility with respect to the *86 determination and placing of signs, that two accidents in an area over a period of 10 years would not require signing for hazardous conditions, but if a series of accidents occurred in an area, then consideration would have to be given for the placing of appropriate signs.
Dennis Danko, an accident investigator employed by the State Department of Transportation, testified that he had searched the records of accidents on Hunt’s Curve for the past 10 years — ■ namely, 1962 to 1972 — and that he had found only three reports (these were the reports of the Andrews and Wehnes accident which had occurred at 5:45 a.m. that morning, the Avezzano accident which had occurred at 7:15 a.m. that morning, and the Riccobonno-Ritter accident which occurred at approximately 7:30 that morning), that recommendations with respect to signs to be placed would be among the records in the hands of the sign foreman, and that he found no other reports of accidents in the Hunt’s Curve area than the three which he produced.
Edward Hunt, who lives several hundred feet from Hunt’s Curve, testified that he had lived there for some 35 years, had observed that the curve could become slippery even though it might by dry on other areas of Route 55, that such slipperiness could be caused by the high ledge of rock to the south which shades the curve as well as by moisture and by temperature drop, that from 1959 to 1969 more than one accident a year occurred on Hunt’s Curve, that he had seen guard rails and posts along the curve which had been hit, that he had heard crashes and had gone out from his home to look, and that he thought police responded to each such accident. The court notes that despite this testimony, statistics kept by Mrs. Virginia Martin, Statistics Clerk of the County Traffic Safety Board, and the above-described records which Mr. Danko searched, revealed no record of a similar previous accident.
Clarence J. Wells, a resident engineer employed by the State Department of Transportation and in whose jurisdiction Hunt’s Curve was located, testified that sanding patrols normally operated between 7:30 a.m. to 4:00 p.m. during the daytime and that at other hours, they responded to phone calls that came in from law enforcement officials or others with respect to icy conditions that might be found or that might develop during other hours, that he never had an experience where an icy condition developed at night where it was not reported or covered outside the regular sanding hours, that there are some areas that tend to become more icy than others and that an effort is made to concentrate on hills and curves first, that with respect to Hunt’s *87 Curve it had been sanded earlier on the morning of November 26,1969 than when Mr. Meyer sanded it as was described above in Mr. Meyer’s own testimony, that with respect to hills, the hill on Route 55 east of its crossing with Route 82 is a 6% grade, whereas Hunt’s Curve is a 3% downgrade for traffic going west, that with respect to weather forecasts, there was a 32 degree Fahrenheit entry past midnight of the night of November 25-26, that the weather was partly cloudy and cool, that at 3:00 a.m. there was an entry that the weather was partly cloudy, warmer tomorrow, that there was an entry at 6:30 a.m. that the man on watch had called Mr. Meyer and others and informed them of icy conditions on Routes 44, 55 and 82 as phoned in by the State Police at the Dover (Plains) Barracks, that so far as the winter of 1969-1970 was concerned, there was no record of snow prior to November 26 and there was only one record of ice prior to such date which was an isolated icy condition at the crossing of Routes 52 and 82 at 8:25 p.m. on the evening of November 21, and that he did not remember whether the curve sign for westbound traffic east of Hunt’s Curve was or was not there at the time of the accident (it was established later in the trial that the sign was there — also, Mr. Meyer testified that he saw the sign when he came through to sand the area just after the Ritter accident).
Joseph F. Volniek, a sign foreman employed by the State Dejftirtment of Transportation, testified that according to his records the left curve sign for westbound traffic and which was located to the east and before the entrance into the curve for westbound traffic was installed between January 25 and January 31,1968 (which-was before the Ritter accident). He based this on diary entries. He also testified that he did not know who ordered the re-signing of Route 55 to its juncture with Route 82, except that it came from Mr. Wells’ office.
Mrs. Sophie Ritter, the widow of Rudolf M. Ritter and. the claimant here, testified that she and her husband moved to Poughquag in 1965 and that they lived there until her husband’s death, that he worked as a carpenter in the employ of a building contractor named Gilbert, that although she had previously worked and had contributed to family income and payment of expenses she was not employed at the time of her husband’s death and was at that time supported by him, that her husband was in good health at the time of his death, that her husband was 63 years of age at the time of his death, that she was 61 years old at that time, that their only child, a daughter, was 33 years of age and not dependent upon her father for support, that *88 Mr. Ritter’s average weekly earnings for the three years prior to his death were $107, that she had paid a funeral hill of $1,120.60, that her husband had been driving a Chevrolet Corvair upon which new tires had been placed the previous Friday with two new front tires and two .snow tires in the rear. It was stipulated by the attorneys that this automobile which had traveled some 80,000 miles had a value of $250 at the time of the accident.
On behalf of the State, portions of the examination before trial of Mrs. Ritter were read into evidence. These portions were to the effect that Mr. Ritter had been continually employed by Mr. Gilbert, that his hours of work were from 9:00 a.m. to 5:00 p.m., that his regular route to work would be by Route 216 to Route 55 upon which he would travel west and including the traversing of Hunt’s Curve, that he worked five days a week and sometimes six days, that he always took the same route out to work and back from work, that on the day of his accident, he left home at 6:55 in the morning and said that he was going to work — his work then being at the Montgomery Ward store, which is south of the City of Poughkeepsie — that when it was necessary to go shopping (she and her husband did so at least once a week) they did so by traveling the same route including going back and forth across Route 55 and over Hunt’s Curve.
Claimant alleges that the State was negligent in that it failed to warn westbound motorists of possible dangerous icy conditions at “ Hunt’s Curve.” Claimant alleges that the State had notice of such conditions because of an accident some 10 years prior on February 12, 1959 at about the same site, which accident claimant contends was sufficiently similar to the issue at bar to have given notice to the State.
Claimant further alleges that the failure of the State Police to remain at the accident site and to warn motorists of the road conditions until the road was .sanded also was negligence for which the State must respond. And, finally, claimant alleges ' that the State was further negligent in its failure to properly construct and maintain Route 55.
With respect to the latter allegation, the claimant did not produce any evidence with respect to maintenance and construction, while the State produced two professional engineers who testified that the highway was designed and constructed in accordance with approved plans and good engineering practice at the time of construction. The State is not required to rebuild unless the curve could not be negotiated at a moderate speed (Kaufman v. State of New York, 27 A D 2d 587).
*89 In 1959 an accident occurred on Hunt’s Curve as the result of icy conditions. Claims were instituted against the State and the awards were affirmed by the Appellate Division (Fincher v. State of New York, 19 A D 2d 762, 763). There the Appellate Division stated that the findings that ¡the road was not properly constucted were “ somewhat more debatable ” and upon the record in that case did not disturb the lower court’s findings and said that the findings with respect to the construction and maintenance were not necessary to support the decision that the Appellate Division affirmed. On the record in the instant claim, the court finds that the construction of the highway conformed with approved plans and good engineering practice at the time of construction. Claimant did not prove that the construction was done in a negligent manner, nor that the curve could not be negotiated at a moderate speed.
Claimant relied heavily on alleged similarity between facts in the Fincher case (supra) and facts in the instant claim.
The .similarity is with respect to the site, the direction of travel and the fact that there was ice on the highway. On the other hand, the Fincher accident occurred in February, in the middle of the winter when the State is on notice of the possibility of ice being in formation due to weather conditions, while the instant accident occurred in the fall and prior to the first snowfall of the season. Likewise, the water which froze in the Fincher situation came from melting snows and where no adverse weather conditions had existed for several days prior, whereas, in.the instant claim, the water on the road came from a misty rain that fell that morning. In the Fincher case the ice resulted from periods of thaw during the day and freezing after the sun was blocked off from the highway surface by the higher terrain to the south.
Between the Fincher case and the instant claim no records of other allegedly similar accidents were presented to the court, except those that occurred immediately before the instant accident. Ten years is remote in time. Between 1959 and the date of the instant claim, many people traveled over the highway in all seasons and under all sorts of weather and road conditions. The court finds that the facts in the instant claim with respect to icy conditions and the causations thereof are not sufficiently similar to those in the Fincher case for the latter to' provide notice to the State of a hazardous road condition of the type and for the time involved in the instant claim.
Nor was the State negligent with respect to the sanding. When called, the sanding crew responded immediately and *90 started out as soon as possible and, seeing an accident close to their operations base, went directly there to sand and then turned and traveled to a more hilly area to the east and sanded it and then they traveled toward Hunt’s, Curve. It must be noted that while the sanding crew had been informed of icy conditions at Hunt’s Curve, they found general icy conditions and sanded two other areas before going to Hunt’s Curve. The . Court finds that their decision to sánd the other two areas, before going toward Hunt’s Curve to sand there, cannot be found to have been imprudent or negligent. The crew knew of the first accident at Hunt’s Curve and could have assumed that,the State Police would be there and that traffic would be handled by them until the sanding was done a few minutes later than if they went directly to Hunt’s -Curve. Conceivably, other accidents may have been prevented by their sanding to the north and to the east before they proceeded west to Hunt’s Curve. Also, the court doubts that they would have sanded Hunt’s Curve before the Ritter accident even if- they had gone to Hunt’s Curve before sanding up the hill to the east. Clearly, they cannot be criticized for having sanded to the north where they saw an overturned car. Accordingly, the court finds that their selection of priorities cannot be found to constitute negligence for which the State must respond.
The court finds that, for the type of weather condition and the resultant icy conditions which developed, it would not be feasible for the State to construct warning signs. This is because it would be necessary to install such signs universally over large areas of the highways of the State.
However, the actions of the State Police require closer scrutiny. Having responded to the previous accident at Hunt’s Curve, the police remained at the site until the injured were attended to and the damaged cars were removed. During this interval, no other calls came which required them to respond elsewhere. When the accident scene was cleared, the State Police left to go off duty, their individual tours of duty having come to an end. Prudent attention, however, should have dictated that these State Police officers remain at the site to warn motorists of the conditions until the sanders arrived (which would have been a matter of minutes) or until an emergency call would have directed them elsewhere. They could have checked by radio as to how soon the sanders would arrive at Hunt’s Curve — both they and the sanding truck had two-way radios. The court is aware -of the fact that the State cannot position police at every icy spot along its many highways. But where an accident has *91 occurred, and where morning traffic toward a city was imminent, prudence should have dictated that the police cars, which were equipped with flashing lights, remain as long as possible or necessary to warn the public. Also, these officers could have set out additional flares. The discovering of a hazardous situation and the possibility of an impending danger to users of1 the highway impose a duty on the State Police to take precautionary measures to prevent an impending tragedy (Peterson v. State of New York, 37 Misc 2d 931, aifd. 19 A D 2d 860, mot. for lv. to app. den. 13 N Y 2d 599; cf. Wolf v. State of New York, Claim Nos. 50952 and 50953 firms Nov. 27, 1970, Goddard, J.).
The qn~stion is now posed as to whether or not the absence of such waruiing by the police was the proximate cause of the accident.
The court cannot assume or speculate that adequate warning would not be heeded, but may assume that if a State Police car with lights flashing or with set-out flares were in position, adequate warning would have resulted in slower speed and a quicker realization of the danger ahead (see Van Tuyl v. State of New York, 6 AD 2d 209, 213, affd. 6 N Y 2d 912).
The testimony of the witness Fells, who had been at Hunt’s Curve to tow away the cars involved in the earlier accident at the site, was that he was returning eastward towards Hunt’s Curve in response to an accident call at the intersection of Route 55 with Route 82 further to the east. As he entered Hunt’s Curve he saw a car (later identified to be the one operated by claimant’s deceased) coming westward, go into a slow spin and then slide sidewards down into the eastbound lane and come into contact with a car directly in front of him which had veered to the right in an attempt to avoid the collision. Claimant’s Exhibits 5 and 6 in evidence are photographs of the accident scene and the cars after the accident. The damages to the cars appear to indicate a collision at a more than a slow speed. A warning of the existing conditions was necessary to slow the speeds of approaching cars. The State Policemen failed to remain at the scene and to give such warning, and in that respect, considering all the surrounding circumstances and facts, were negligent. There has been no showing of any negligence by the claimant’s deceased contributing to the occurrence of the accident.
In determining what is fair and just compensation for pecuniary injury, the court considers the decedent’s age, sex, relationship to the claimant, earning capacity, health, life expec *92 tancy, as well as the age, sex and physical condition of his sole distributee.
Mrs. Sophie Ritter, the deceased’s widow and administratrix of his estate, testified that Mr. Ritter was 63 years of age when he met his death, that she was then 61 years old, that they had a daughter who was then 33 years old and who was not dependent on her father for support, that her husband was healthy at the time of his death, that she worked for many years and contributed to the family income and toward purchases of properties which they bought and sold as they lived in New York City and then later moved to Poughquag where they built their home, that she was not so employed at the time of her husband’s death, that her husband’s average weekly earnings as a carpenter for the three years before his death were $107, and that the funeral bill was $1,120.60. It was stipulated that the automobile was worth $250 on the day of the accident.
The testimony indicates that the deceased was rendered unconscious almost immediately upon impact and remained unconscious until he expired. Accordingly, there is no claim for conscious pain and suffering and none is awarded.
Having considered all the factors with respect to pecuniary injury as above set forth, the court awards claimant the sum of $30,000 as compensation for the pecuniary loss she sustained, to which must be added the amount of the funeral bill in the sum of $1,120 rounded, and the value of the deceased’s automobile in the sum of $250, making a total award of $31,370, together with appropriate interest from November 26, 1969, the date of death (EPTL 5-4.3).
During the course of the trial, several motions were made upon which decision was then reserved. The above decision of the court indicates the court’s disposition of some of these motions. As to those not so disposed of, the court now denies such motions.