OPINION OF THE COURT
Thomas J. Lowery, Jr., J.
On October 28, 1974, the claimants were injured when their vehicles were fired upon by Indians from an adjacent campsite owned by the State of New York at Moss Lake, Herkimer County. These timely filed claims are predicated on the State’s negligence in failing to take adequate measures to abate the known dangerous condition.
FACTUAL BACKGROUND
The State acquired the Moss Lake campsite in 1973 as part of the Adirondack Forest Preserve. The land was improved with several buildings which were formerly used as part of a Girl Scout summer camp. Numerous hiking trails meandered throughout the area. The campsite was bisected by Big Moose Road, a rural county highway, that coursed in a north-south direction between the hamlet of Eagle Bay and Big Moose.
In May of 1974, a group, representing themselves as Mohawk Indians, took possession and claimed ownership of the campsite. They immediately posted signs on both sides of Big Moose Road, which warned that the site was patrolled by the "Warrior Society”. Bunkers and foxholes were placed at various locations to the west of the road. Armed patrols were maintained throughout the site and particularly along Big Moose Road. In sum, the occupied lands resembled an armed encampment.
Indian patrols physically ousted hikers and others who *1018 entered upon the property. Additionally, Indians bearing weapons stopped motorists on Big Moose Road. On at least one occasion, approximately eight days prior to the subject incidents, there was a confrontation with a motorist which involved the discharge of weapons.
The State was aware of the aforesaid activities and the danger posed to motorists on Big Moose Road, prior to October 28, 1974. In response, they merely stepped up patrols on the roadway, investigated complaints without entering the campsite and gathered information from individuals in the area. Although it may have been crucial to the case, the State introduced no evidence that its failure to take other action was the result of a high-level policy decision.[1]
Sometime after 4:00 p.m. on October 28, 1974, Steven Drake, accompanied by his brother Michael, left Eagle Bay and drove north on Big Moose Road. While passing the Moss Lake campsite they yelled "war whoops” and, within seconds, gunshots were fired in their direction from the campsite. The Drakes sped from the scene and minutes later stopped at a restaurant at Big Moose. Upon arrival, Steven Drake advised the State Police of the shooting incident by telephone. The call was received at 4:55 p.m. Steven was advised only that the State Police would investigate the incident.
At approximately 5:15 p.m. the Drakes returned to their car and placed a tire jack in the back seat. With Steven driving, they started their return trip. When they were approximately one quarter of a mile north of the main entrance to the campsite, they observed Indians at the gate. Proceeding further, they saw that the Indians were armed. As they passed, the Indians fired at the car, shattering its windows. Both Steven and Michael Drake were hit by the gunfire. Thereafter, they proceeded to the home of George Sehring, a State Environmental Conservation Officer, who lived nearby on Big Moose Road. An ambulance was called and the Drakes were transported to the Old Forge Medical Center.
The State Police received notice of this shooting at about 5:50 p.m. Thereafter, at least 11 police officers became involved in the investigation. While nine of these officers proceeded to the Medical Center, purportedly to investigate the incident, not one was dispatched to the Moss Lake campsite. Although *1019 the establishment of roadblocks was discussed as early as 6:15 p.m., none were established until 8:00 p.m., and then only to the south of the campsite.
At about the time that the roadblock was finally established to the south of the campsite, the Madigan family was approaching the awaiting ambush from the north. As they passed the main gate, they were met by a volley of gunfire. Aprile Madigan, age nine years, was seriously injured.
state’s negligence
The general rule in New York is that the State, acting in its governmental capacity, cannot be cast in damages for its failure to furnish police protection to a particular individual. (Riss v City of New York, 22 NY2d 579; Dutton v City of Olean, 60 AD2d 335, affd 47 NY2d 756; Zibbon v Town of Cheektowaga, 51 AD2d 448, app dsmd 39 NY2d 1056; Bass v City of New York, 38 AD2d 407, affd 32 NY2d 894.) The rule is based on the principle that courts should not review policy decisions of co-ordinate branches of government concerning the availability and allocation of limited police resources. (Riss v City of New York, supra.)
The general rule does not apply where there is owed a special duty to the claimant. This duty may be created where the status of the claimant gives rise to a special relationship. Thus, a special duty is owed to informers (Schuster v City of New York, 5 NY2d 75), undercover agents (Swanner v United States, 309 F Supp 1183), persons under court orders of protection (Baker v City of New York, 25 AD2d 770), and school children where a municipality has assumed a responsibility of providing crossing guards (Florence v Goldberg, 44 NY2d 189). Another way the duty may be created is where a special relationship arises from affirmative acts which affect the interests of the claimant adversely. (Moch Co. v Rensselaer Water Co., 247 NY 160; Prosser, Torts [4th ed], § 56, p 340.) This may occur where the claimant has been induced to rely on statements or other acts, to his deteriment. (Zibbon v Town of Cheektowaga, supra.) It may also arise where affirmative police action is so integrally related to the sequence of events leading to the claimant’s injury that it may be said that the action itself created the danger. (Jones v County of Herkimer, 51 Misc 2d 130.) In absence of some affirmative action, however, a special duty is not created merely because an individual is likely to be endangered by known criminal *1020 activity. (Riss v City of New York, supra; Dutton v City of Olean, supra; King v City of New York, 3 Misc 2d 241.)
In the present case, the status of the Drakes and the Madigans as motorists did not give rise to a special relationship obligating the State to provide police protection. (Pinkney v City of New York, 50 AD2d 928, affd 40 NY2d 1004; Evers v Westerberg, 38 AD2d 751, affd 32 NY2d 684; Matter of Santana v New York State Thruway Auth., 92 Mise 2d 1.) Further, no affirmative action was .taken by the State Police that affected the interests of the claimants adversely. The Drakes, although informed that the State Police would investigate the incident, were not told that police protection would be forthcoming. Therefore, no statements were made on which the Drakes could justifiably have relied. Moreover, even assuming that there was a promise of police protection, the actions of the Drakes in returning to the scene so quickly, with a tire jack in the back seat, belies any claims of reliance. The Madigans had not communicated with the State Police and were not aware of their activity. Although the State Police inexpeditiously undertook to establish roadblocks north of the encampment, such action placed the Madigans in no worse a position than had the police done nothing at all. In sum, no liability can exist for the State’s failure to provide police protection.
A duty exists, however, predicated on the State’s status as a landowner, separate and distinct from any duty to provide police protection. As a landowner, the State acts in its proprietary capacity rather than its governmental capacity and owes the same duty of care as that of a private individual. (Caldwell v Village of Island Park, 304 NY 268; Augustine v Town of Brant, 249 NY 198; Stevens v Pittsburgh, 329 Pa 496.) A landowner must exercise reasonable care to abate a known dangerous condition existing on his lands, if he has an opportunity to do so. (Hogle v Franklin Mfg. Co., 199 NY 388; 46 NY Jur, Premises Liability, § 2; Prosser, Torts [4th ed], ch 10.) It makes no difference whether the source of the danger relates to a physical condition (Shaknis v State of New York, 251 App Div 767, affd sub nom. Doulin v State of New York, 277 NY 558), or arises from the activities of third parties (Townsley v State of New York, 6 Misc 2d 557; Gleason v Hillcrest Golf Course, 148 Misc 246), which may include the known activities of trespassers. (De Ryss v New York Cent. R. R. Co., 275 NY 85; Prosser, Torts [4th ed], § 57, pp 356-357; *1021 see, also, Hogle v Franklin Mfg. Co., supra, p 396.) Moreover, it makes no difference whether the person injured is on the land itself (Caldwell v Village of Island Park, supra), or on an adjacent highway. (Clawson v Central Hudson Gas & Elec. Corp., 298 NY 291; Ford v Grand Union Co., 268 NY 243; Klepper v Seymour House Corp. of Ogdensburg, 246 NY 85; Rill v Chiarella, 50 Misc 2d 105.)[2] In the performance of this duty the landowner must use all means at his disposal, which in the case of the State may include the use of police. (Stevens v Pittsburgh, supra; Bucholz v City of Sioux Falls, 77 SD 322; Gaines v Village of Wyoming, 147 Ohio St 491; see, also, Caldwell v Village of Island Park, supra.) In such a case it is the breach of this duty which gives rise to liability, not the failure to provide police protection. (Caldwell v Village of Island Park, supra; Stevens v Pittsburgh, supra; Honaman v Philadelphia, 322 Pa 535.)
It is unquestioned that the State was the owner of the Moss Lake campsite which abutted Big Moose Road. The activities of the Indians on this land clearly posed a danger to travelers on the road. The State, prior to October 28, 1974, had notice of the imminent danger. It had a duty to take such action reasonably within its power to protect against the known danger. Yet it did nothing other than investigate the several complaints. More was required under the circumstances.
An additional duty, applicable here, is that of the State to maintain its highways in a reasonably safe condition. (Boyce Motor Lines v State of New York, 280 App Div 693, affd 306 NY 801.) Ordinarily, liability will be imposed upon the municipality or governmental agency which controls the road. (Hafele v State of New York, 274 App Div 1022; Petzold v State of New York, 202 Misc 255.) Where, however, the State assumes control over the highway, it will be held liable for failing to keep it reasonably safe. (Rindfleisch v State of New York, 59 Misc 2d 1074, affd 32 AD2d 892, affd 27 NY2d 762; Harvey v New York State Thruway Auth., 59 Misc 2d 1079, affd 32 AD2d 889, affd 27 NY2d 762; Matter of Santana v New York State Thruway Auth., 92 Misc 2d 1, supra.)
The evidence presented here, when taken in its totality, clearly demonstrates that the State assumed control over Big *1022 Moose Road adjacent to the Moss Lake encampment. Particular note is made of the fact that the State Police patrolled the road on a regular basis and had increased such patrols subsequent to the take-over of the campsite. Moreover, the local police officials were told that all incidents involving the Indians would be handled by the State Police. The existence of control is confirmed by the evidence that the State established roadblocks, unfortunately too late to prevent the claimants’ injuries. Under such circumstances, the State was obliged to take all reasonable steps to abate the danger to travelers on the highway. (Ritter v State of New York, 74 Misc 2d 80; Peterson v State of New York, 37 Misc 2d 931, affd 19 AD2d 860, mot for lv to app den 13 NY2d 599; Bergen v Koppenal, 52 NJ 478.) Reasonable means existed to accomplish this end. Yet, as stated, the State did nothing despite an opportunity to do so.
The State, relying on the doctrine set forth in Weiss v Fote (7 NY2d 579), defends its inaction by seeking to hide behind the shield of governmental immunity. In doing so, it erroneously interprets the holding in People ex rel. Dew v Reid (82 Misc 2d 583), by extracting certain language, which, when taken out of context, suggests that the choice of action in the present case was a matter lying solely within the State’s discretion. Such language, however, relates only to the State’s constitutional obligation to preserve forest lands in their forever wild state. That obligation is totally irrelevant to the State’s aforesaid duties. Moreover, the evidence before this court is insufficient to establish that any governmental policy decision was made, either with respect to ejectment or supervision of the Indians.[3] Even assuming arguendo that a policy decision was made, it could not militate against the affirmative duty the State owed to exercise reasonable care to abate a known dangerous condition existing on land under its control. Hence, the State’s claim of immunity must be rejected.
The court finds that the State negligently breached the duties of care enjoined upon it by its ownership of land and by *1023 its control over a highway. In making this finding, the court has not relied upon any tort liability predicated on the State’s failure to provide police protection.
CONTRIBUTORY NEGLIGENCE
Aprile Madigan and her father, Roger J. Madigan, were entirely free from contributory negligence.
Michael and Steven Drake, however, have failed to demonstrate that they were free of fault. They were patently aware of the potential danger of a return trip past the Moss Lake encampment. It is obvious from their placement of a tire jack in the back seat of their car that they anticipated trouble. There was no compelling reason for them to return past the campsite so soon after reporting a shooting incident which, arguably, they themselves provoked. In doing so, they acted in reckless disregard for their own safety and clearly assumed the risk of injury.
DAMAGES
Aprile Madigan[4] was struck in the back by two projectiles which tumbled through her abdominal cavity, causing the following injuries: Partial destruction of the upper pole of the left kidney; partial destruction of the left lobe of the liver; perforation of the front and back walls of the stomach; perforation and destruction of portions of the middle (jejunum) and lower (ileum) sections of the small intestine; perforation and damage to the large intestine; damage to the pancreas; internal hemorrhaging; peritonitis resulting from spillage of stomach and bowel contents into the abdominal cavity; and an injury to the anterior reflection of the diaphragm. One of the projectiles, which caused the aforesaid injuries, ultimately lodged in her heart cavity.
Aprile, in grave danger of her life, was transported to St. Luke’s Hospital in Utica, New York. Here she underwent two hours of emergency treatment, followed by four hours of surgery. Bullet fragments were extracted from her abdominal cavity. Portions of her stomach, liver, and intestines were removed and the balance reconstituted and repaired. Her other damaged internal organs were also repaired. Because of the severity of this procedure, the bullet in her heart cavity *1024 was not removed at this time. She remained on the critical list until November 9, 1974 and was thereafter discharged from the hospital for the first time on November 14, 1974.
On January 10, 1975, she was readmitted to St. Luke’s Hospital where surgery was performed to remove the remaining bullet from her heart cavity. She remained at the hospital until January 28, 1975.
As a consequence of the aforesaid painful injuries and surgery, there exists a disfiguring scar extending over the entire midline of Aprile’s abdomen. Another disfiguring scar exists under her left breast, at the site of the second surgery. Additionally, two disfiguring scars exist where the bullets entered her back. One, about the size of a dime, is located over her left buttock and the second, about the size of a quarter, is found in the lower midportion of her back. Her physician opined that the appearance of these scars could be somewhat improved by plastic surgery when she reached 16 to 18 years of age, but they could not be entirely eliminated. The cost of this procedure was estimated to be $3,000. Moreover, there is a possibility that Aprile will suffer from intestinal blockage caused by adhesions resulting from the surgery.
In addition to her physical injuries, Aprile suffered considerable mental anguish. Immediately following the incident, Aprile believed she was going to die. For three years thereafter, she experienced nightmares frequently and these have continued intermittently to date.
Hospital and medical expenses were incurred by Aprile’s father, Roger J. Madigan, for the treatment of her injuries, in the amount of $7,613.67.
Evidence was submitted of expenses incurred by Roger J. Madigan for lost earnings and lodging expenses while visiting Aprile at the hospital. These items are not proper elements of damage. (See, generally, NY Damages Law, §§ 1222, 1223; 1 NY PJI2d 2:318.)
A claim was also made on behalf of Roger J. Madigan for loss of his daughter’s services and damage to his automobile. No evidence, however, was submitted in this regard.
Finally, no punitive damages are appropriate here.
By reason of the foregoing, the court awards Roger J. Madigan, as parent and natural guardian of Aprile Madigan, the sum of $150,000 for all injuries and damages sustained by Aprile Madigan. In addition, Roger J. Madigan, individually, *1025 is awarded the sum of $7,613.67 for hospital and medical expenses incurred as a result of treatment rendered to Aprile Madigan.
MOTIONS
The State’s motions to dismiss the claims of Steven Drake and Michael Drake are now granted, and Claims Nos. 59033 and 59058 are hereby dismissed. All other motions, upon which the court reserved decision, are hereby denied.

. Parenthetically, the court notes that the only evidence that may have shed some light on this matter was excluded upon the State’s objection.

. Whittaker v Village of Franklinville (265 NY 11) is inapposite, since the village had no prior notice of a dangerous condition.

. The record reveals that a directive was issued by the Deputy Superintendent of State Police that members of the State Police were not to interfere with the Indians because the Department of Environmental Conservation (ENCON) would handle the situation; a directive from an ENCON field office to the effect that ENCON Enforcement Officer Sehring was not to enter the campsite; and a directive from an unknown source to Senior Investigator Gildersleeve that he was to avoid a confrontation. This evidence hardly amounts to proof that the State made a high level policy decision of the type envisioned by Weiss v Fote (supra).

. Aprile Madigan, in good health and nine years of age at the time of this incident, had a life expectancy of 68.2 years. (1 NY PJI2d 152-153 [Supp].)