677 F.2d 957
 Marianne E. ENGBLOM and Charles E. Palmer, Plaintiffs-Appellants,
v.
Hugh L. CAREY, Governor of the State of New York, Richard D.
Hongisto, Acting Commissioner, New York State Department of
Correctional Services, Joseph C. Snow, Superintendent of the
Mid-Orange Correctional Facility, Major-General Vito J.
Castellano, Chief of Staff to the Governor of New York, New
York National Guard, Lieutenant-Colonel Justin M. Queally,
an Officer of the 106th Maintenance Battalion of the New
York National Guard, Captain "John" Drew, an Officer of the
101st Signal Battalion of the New York National Guard, and
Various Officers and Enlisted Men, Members of the New York
National Guard, Defendants-Appellees.
 No. 732, Docket 81-7769.
 United States Court of Appeals,
Second Circuit.
 Argued March 1, 1982.
Decided May 3, 1982.
 
 Alan N. Sussman, Kingston, N. Y. (Ricken, Goldman, Sussman & Blythe, Kingston, N. Y., of counsel), for plaintiffs-appellants.
 Arlene R. Silverman, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen., State of N. Y., George D. Zuckerman, Asst. Sol. Gen., New York City, of counsel), for defendants-appellees.
 Before FEINBERG, Chief Judge, and KAUFMAN and MANSFIELD, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 In this action, brought in the Southern District of New York under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343(3) & (4) by two correction officers at the Mid-Orange Correctional Facility ("Mid-Orange") in Warwick, New York, against the Governor and various officials of the State of New York, plaintiffs-appellants contend that their due process and Third Amendment rights were violated during a statewide strike of correction officers in April and May of 1979 when they were evicted from their facility-residences without notice or hearing and their residences were used to house members of the National Guard without their consent. For the first time a federal court is asked to invalidate as violative of the Third Amendment the peacetime quartering of troops "in any house, without the consent of the Owner."[1] District Judge Robert W. Sweet granted defendants' motion for summary judgment dismissing the complaint on the ground that appellants did not have a sufficient possessory interest in their facility-residences to entitle them to protection under the Third Amendment and the Due Process clause of the Fourteenth Amendment. We affirm the dismissal of the due process claim on the ground that adequate post-deprivation procedures were afforded to protect appellants' rights. We reverse the dismissal of the Third Amendment claim on the ground that issues as to material facts rendered summary judgment inappropriate.[2]
 
 
 2
 In summarizing the facts below we are guided by the principles that summary judgment may be granted only where there is no genuine issue as to any material fact and that upon review the inferences to be drawn from the materials submitted to the district court "must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); see Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 444 (2d Cir. 1980); Heyman v. Commerce & Industry Insurance Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975); Judge v. City of Buffalo, 524 F.2d 1321 (2d Cir. 1975). At the time of the strike appellants had worked at Mid-Orange for nearly two years and were residing in housing located on the grounds of the facility. Of the total staff of some 210, approximately 36-45 officers resided in the "Upper and Lower Staff Buildings" located at Mid-Orange. Although only employees were eligible to live there, such residence was optional on the employee's part and not a condition of employment.[3]
 
 
 3
 The Upper Staff Building was appellants' sole residence. The building, located about a quarter mile from the prison, consists of a layout of living facilities, each comprising a room with semi-private or private bath, and sharing common kitchens. Aside from the fixtures and a bed and dresser, the occupants of each facility supplied all other furnishings and accessories. The occupancy or "tenancy" was governed by two Correction Department documents. One was entitled "Facility Housing-Rules and Regulations" ("Rules"), signed by the occupants and Superintendent Joseph C. Snow, setting forth various conditions. The other, a "Department Directive" dated January 29, 1976 ("Directive"), set forth the procedure for selecting occupants and additional conditions of the occupancy.[4] These documents throughout refer to the occupants as "tenants" and to the $36 deducted monthly from the payroll of each occupant as "rent" or "rental cost." The Directive made clear that the rent was not to be treated as a mere business expense; it specified that the rental cost could not be deducted by a resident-officer from his salary for income tax purposes. The Directive also obligated Mid-Orange to repair and maintain the rooms "in accordance with normal 'landlord-tenant' responsibilities and practices."
 
 
 4
 These documents placed various restrictions on the occupants. For example, overnight and long-term guests were prohibited, the rooms could be opened by a master key, personally owned firearms were not permitted to be stored in the rooms, and the rooms were subject to inspection.[5] There was no evidence, however, concerning the extent to which these restrictions were enforced. The documents also provided that an occupant could be evicted on designated grounds but only after an investigation and a six-month written notice to vacate. In an emergency the Superintendent was empowered to "suspend such portions of any or all rules which might impede proper emergency action."[6]
 
 
 5
 On April 18, 1979, a statewide strike was called by the Security and Law Enforcement Employees Council 82, AFL-CIO. On that day Governor Hugh L. Carey issued a Proclamation and Executive Order activating the National Guard. On April 19 most of the officers at Mid-Orange joined the strike. Either on that day or the following day Superintendent Snow because of the strike issued an order barring striking employees from the facility grounds unless they obtained his permission. At 12:10 A.M. on April 21 Snow finally declared an emergency at Mid-Orange. Beginning around April 19, National Guardsmen had begun arriving at Mid-Orange, eventually reaching a maximum force of 260.
 
 
 6
 As a result of these developments, from April 19 to April 25 appellants and other employees believed to be on strike were repeatedly denied access to the administration building. Striking officers who lived in staff housing were thus also denied access to their apartments, with one exception on April 20 when appellant Engblom was permitted to retrieve some personal items. The payroll rental deductions were cancelled effective April 19, 1979. Some time before April 25 a decision was made by Mid-Orange to clear the rooms that had been leased to the striking officers so that the rooms could be used to house National Guardsmen, who until then had been housed in the school and administration buildings.[7] On April 25 officer-tenants were permitted to enter and remove and store their belongings in a locked storage area in the building, and appellants did so.[8] Their rooms had been ransacked and personal property was found to be missing or destroyed. Beginning at the same time Guardsmen were housed in these rooms and remained until the end of the strike on May 5. It is undisputed that Palmer's room was so used. While Snow's affidavit states that Engblom's room was never occupied by Guardsmen, this was disputed by Engblom's affidavit.
 
 
 7
 Participation in the strike was the sole reason for evicting resident staff-tenants and using their rooms to house the Guard. However, at no time prior to the evictions did Mid-Orange provide notice or undertake investigations in accordance with its own regulations. Palmer joined the strike on April 19 and remained on strike through May 3. However, there is a dispute concerning Engblom's alleged participation. Snow stated in his affidavit that he had received second-hand reports that Engblom had been seen on the picket lines and engaging in vandalism. Engblom's affidavit, however, stated that April 18 and 19 were her scheduled days off and that thereafter she was absent from work for medical reasons.[9]
 
 
 8
 When the strike was over on May 5, appellants were made an offer to resume residence in their staff housing, which they declined. Neither was terminated and both continue to work as correction officers at Mid-Orange.
 
 
 9
 On a motion for summary judgment the district court dismissed appellants' Third Amendment and due process claims. The district court found, as an initial matter, that the National Guardsmen were "Soldiers" within the meaning of the Third Amendment, that 42 U.S.C. § 1983 was properly invoked since the Guard is basically a state organization, Mela v. Callway, 378 F.Supp. 25, 28 (S.D.N.Y.1974), and that the Third Amendment is incorporated into the Fourteenth Amendment since it is one of the "fundamental" rights "rooted in the tradition and conscience of our people" and thus "implicit in the concept of ordered liberty." Griswold v. Connecticut, 381 U.S. 479, 499, 85 S.Ct. 1678, 1689, 14 L.Ed.2d 510 (1965) (Harlan, J., concurring); Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). However, the court held that appellants were not entitled to Third Amendment protection since their occupancy was analogous to possession incident to employment, which, said the court, "carries with it a somewhat lesser bundle of rights than does a tenancy." The court also rejected appellants' due process claim on the ground that whatever property interest they had was insufficient to warrant due process protection and that neither the Department's regulations nor New York State's landlord-tenant laws accorded them substantive rights protected by the Constitution. Furthermore, the district court held that there was no deprivation here since appellants, by striking, relinquished any rights they may have had in their residences.[10]
 
 DISCUSSION
 
 10
 We first address the novel claim based on the Third Amendment, a provision rarely invoked in the federal courts. We agree with the district court's conclusion that the National Guardsmen are "Soldiers" within the meaning of the Third Amendment and that they are, except perhaps when "federalized" by unit under 10 U.S.C. §§ 331, 332, 672, state employees under the control of the Governor. Moreover, we agree with the district court that the Third Amendment is incorporated into the Fourteenth Amendment for application to the states.
 
 
 11
 The crux of appellants' Third Amendment claim depends on whether the nature of their property interest in their residences is sufficient to bring it within the ambit of the Third Amendment's proscription against quartering troops "in any house, without the consent of the Owner." The absence of any case law directly construing this provision presents a serious interpretive problem, and little illumination can be gleaned from the debates of the Constitutional Convention. We are thus left with the language of the Third Amendment and analogies to other areas of law. Under a technical and literal reading of the language, the Third Amendment would only protect fee simple owners of houses.[11] We reject such a formalistic construction for the same reasons that it has been rejected in analogous contexts.
 
 
 12
 The Third Amendment was designed to assure a fundamental right to privacy. Griswold v. Connecticut, 381 U.S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965); Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), at 552, 81 S.Ct. at 1781 (Douglas, J., dissenting), 549, 81 S.Ct. at 1779 (Harlan, J., dissenting). Since the privacy interest arises out of the use and enjoyment of property, compare Griswold, supra (privacy in marital relationship), an inquiry into the nature of the property-based privacy interest seeking protection becomes necessary. In closely analogous contexts rigid notions of ownership are not prerequisites to constitutional protections. When determining whether a legitimate expectation of privacy exists for the purposes of the Fourth Amendment, for instance, the Supreme Court has rejected the notion that a protected privacy interest in a place must be "based on a common-law interest in real or personal property." Rakas v. Illinois, 439 U.S. 128, 143-44 n.12, 99 S.Ct. 421, 430-31 n.12, 58 L.Ed.2d 387 (1978). Rather, the Court stated that "one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy." Id. (emphasis added). Similarly, in applying the due process clause, the Court has extended its procedural protection "well beyond actual ownership of real estate, chattels, or money," Board of Regents v. Roth, 408 U.S. 564, 572, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972), and has interpreted "property" as "not limited (to) a few rigid, technical forms," but as "denot(ing) a broad range of interests that are secured by 'existing rules or understandings.' " Perry v. Sinderman, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). A rigid reading of the word "Owner" in the Third Amendment would be wholly anomalous when viewed, for example, alongside established Fourth Amendment doctrine, since it would lead to an apartment tenant's being denied a privacy right against the forced quartering of troops, while that same tenant, or his guest, or even a hotel visitor, would have a legitimate privacy interest protected against unreasonable searches and seizures. See, e.g., Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) (friend's apartment); United States v. Agapito, 620 F.2d 324, 333-35 (2d Cir.) (hotel room), cert. denied, 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980); United States v. Bell, 488 F.Supp. 371 (D.D.C.1980) (apartment tenant).
 
 
 13
 Accordingly we hold that property-based privacy interests protected by the Third Amendment are not limited solely to those arising out of fee simple ownership but extend to those recognized and permitted by society as founded on lawful occupation or possession with a legal right to exclude others. Rakas, supra, 439 U.S. at 143-44 n.12, 99 S.Ct. at 430-31 n.12. Cf. United States v. Ochs, 595 F.2d 1247, 1253 (2d Cir.) (complete "dominion and control" over car creates privacy interest), cert. denied, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979). While the determination looks first to state law as the "primary source of property rights," Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 448 (2d Cir. 1980), ultimately the issue is one of "federal constitutional law." Memphis Light, Gas & Water Division v. Craft, 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978) (quoted in Quinn, supra, 613 F.2d at 447).
 
 
 14
 Applying these principles, as a matter of state law appellants throughout the strike had a lawful interest in their living quarters sufficient to entitle them to exclude others. Even assuming arguendo, as the district court found, that appellants' occupancy interest was merely incidental to their employment, they could not be deprived of that interest without notice, a hearing and judicial determination, N.Y. Real Prop. Actions and Proceedings Law § 713(11), none of which was accorded them. If, as we conclude, appellants had a more substantial tenancy interest, the procedural protections afforded them under state law would be even greater. See e.g., id., at §§ 711, 713; N.Y. Real Prop. Law § 228. Thus, even if pre-deprivation due process procedures were not available to them, they retained a protectible interest in their quarters until they were lawfully deprived of it.
 
 
 15
 Appellants' interest, moreover, reasonably entitled them to a legitimate expectation of privacy protected by the Third Amendment. Appellants' rooms, which they furnished and for which they were charged a monthly rent, were their homes. They did not maintain separate residences or have alternative housing available in the event of an emergency. During the entire two-year period preceding the strike, appellants did not reside in any other dwelling. These factors supporting the existence of a tenancy-type interest are reinforced by the Department's Directive and Rules, which repeatedly refer to the occupants as tenants and at one place to Mid-Orange as the equivalent of a landlord. See Lahti v. State, 98 Misc.2d 829, 414 N.Y.S.2d 607, 609 (Ct.Cl.1979) (terms used in an instrument, while not conclusive, are indicative of parties' intent). Although the Rules and Directive placed restrictions on the terms of the occupancy, the record does not reveal whether those restrictions, such as the prohibition of overnight guests and the provision for inspections at any time, were ever in fact enforced. Viewing the facts in the light most favorable to appellants, we cannot rule out an inference that the Rules signed by both the Superintendent and appellants was tantamount to a lease. See, e.g., Miller v. City of New York, 15 N.Y.2d 34, 255 N.Y.S.2d 78, 80, 203 N.E.2d 478, 480 (1964); Statement, Inc. v. Pilgrim's Landing, Inc., 49 A.D.2d 28, 370 N.Y.S.2d 970, 974 (1975).
 
 
 16
 On this record we cannot agree with the district court's finding that appellants' occupancy was more analogous to a possession incident to employment, which under New York law does not constitute a landlord-tenant relationship. N.Y. Real Prop. Actions and Proceedings Law § 713. Snow's affidavit stating that employees were housed on the premises for the purpose of having personnel close at hand at all times is contradicted by the written Rules and Directive governing the relationship. In addition, the Directive's priority list for selecting housing applications contains two categories of employees, only one of which is designated "Facility employees whose presence is desired near the institution;" the other employee category contains no such restriction. Thus not only does Mid-Orange's selection procedure specifically contemplate housing some employees whose presence is not for the facility's benefit, but there is also no record information as to the employee category from which appellants were chosen. Finally appellants' jobs were not conditioned on their living in staff housing; nor was staff housing provided as a form of remuneration for their employment. It was only after appellants had been on their jobs as correction officers that they became eligible to apply for staff housing. Thus New York decisions relied upon by the district court are not on point, since they all involve apartment superintendents whose jobs required occupancy on the premises.[12]
 
 
 17
 We conclude, therefore, that in the context of a motion for summary judgment the record, viewed most favorably to appellants, does not preclude a finding that they had a substantial tenancy interest in their staff housing, and that they enjoyed significant privacy due to their right to exclude others from what were functionally their homes. See Statement, Inc., supra, 49 A.D.2d 28, 370 N.Y.S.2d at 975 ("a tenancy involves an interest in real property which passes to the tenant, and a possession exclusive even of that of the landlord, except as the lease permits the landlord's entry"). Accordingly, since we cannot say that as a matter of law appellants were not entitled to the protection of the Third Amendment, we reverse the summary dismissal of their Third Amendment claim.
 
 
 18
 Appellants next claim that, regardless whether the quartering of soldiers in their facilities violated their Third Amendment rights, the summary eviction of them from their premises without prior notice and a hearing violated their due process rights. The district court held that neither as a matter of state law nor federal constitutional law did appellants have a sufficient property interest protected by the due process clause. For reasons already indicated, we disagree. In our view their tenancy-type interest was sufficient to invoke the due process clause[13] and they suffered a deprivation of that interest when they were barred from their rooms during the course of the strike.[14]
 
 
 19
 The question remains, however, whether the state's failure to afford appellants prior notice and a hearing before the deprivation violated their due process rights. Appellants point to the Department's own regulations providing for six months notice and an investigation prior to eviction and to New York landlord-tenant law under which even a squatter or licensee is entitled to 10 days notice, personal service, a hearing and a judicial determination prior to eviction. N.Y. Real Prop. Actions and Proceedings Law § 713(3) & (7). But the regulations were suspended during the declared emergency, and the procedural safeguards provided by state law, while relevant to determining whether appellants remained in lawful possession, do not establish what process is due as a matter of federal constitutional law. The requirements of due process are inherently flexible, and turn on an analysis of the private and government interests involved in each particular situation. Mathews v. Eldridge, 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976).
 
 
 20
 In Parratt v. Taylor, 451 U.S. 527, 539, 101 S.Ct. 1908, 1915, 68 L.Ed.2d 420 (1981), the Supreme Court recently articulated the requirements of due process in a situation where prior notice and hearing is impracticable, summarizing its earlier holdings:
 
 
 21
 "These cases recognize that either the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process can, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, satisfy the requirements of procedural due process."The "necessity of quick action" in denying appellants access to their quarters and the "impracticability of providing any meaningful predeprivation process" can hardly be doubted here. Mid-Orange was thrown into a state of emergency by the decision of all but a few of the staff of 210 to join the statewide strike. Approximately 260 National Guardsmen, untrained in corrections work, were called in on extremely short notice to take their places. The Superintendent had received reports of vandalism and improper use of state facilities by striking officers. Prompt counter-measures were essential. Thus the decision to bar striking employees from the facility, which necessarily had the effect of barring resident employees from their rooms, did not deny them due process merely because of the lack of pre-deprivation procedures.
 
 
 22
 The key inquiry, therefore, is whether appellants had adequate post-eviction process to test "the propriety of the State's action." What minimum process was due here depended in part on the nature of the private interest at stake and the extent of the deprivation alleged. Mathews v. Eldridge, supra, 424 U.S. at 334, 96 S.Ct. at 902. Since appellants were offered the return of their rooms immediately after the short strike, their dispossession was very limited in nature and in our view amply remediable by post-deprivation procedures. To the extent that the state's exclusion of appellants from their premises amounted to a disciplinary suspension of state employees pending an investigation of alleged misconduct,[15] a post-suspension hearing was available under state law. N.Y. Civil Service Law § 75(3). See McIntyre v. N.Y. City Dept. of Corrections, 411 F.Supp. 1257 (S.D.N.Y.1976) (upholding constitutionality of post-suspension hearing procedure). Furthermore, § 112 of the N.Y. Correction Law empowers the commissioner of corrections to inquire into any improper conduct by any person and § 126 provides that the "superintendent of a correctional facility shall be liable to indictment and punishment for any wilful neglect of duty, or for any malpractice in the discharge of the duties of his office." N.Y. Corrections Law §§ 112, 126. Both avenues permit appellants to challenge the propriety and necessity of their temporary dispossession and allow Engblom specifically to challenge whether the Superintendent was entitled to assume that her absence from work was due to her participation in the strike. Finally, to the extent that their eviction occurred in order to provide housing to Guardsmen, appellants may possibly have a remedy in § 123-b of the N.Y. State Finance Law, which permits appellants to seek equitable or declaratory relief for "wrongful expenditure, misappropriation, misapplication, or any other illegal or unconstitutional disbursement of state funds or state property." N.Y. State Finance Law § 123-b.[16]
 
 
 23
 Because we find that post-deprivation procedures provide adequate means for appellants to challenge their admittedly limited deprivation, we hold that the absence of pre-deprivation process did not violate their due process rights. We therefore affirm the summary dismissal of appellants' due process claim but on substantially different grounds from those advanced by the district court.
 
 
 24
 Our affirmance of the dismissal of appellants' due process claim is not inconsistent with our holding that it was error summarily to dismiss their Third Amendment claim. The form of due process to which appellants were entitled with respect to eviction of them from their premises, i.e., a post-deprivation hearing instead of a pre-deprivation hearing, is to be determined by different standards than those governing the question of whether their Third Amendment rights were violated. The emergency which justified the Superintendent's taking immediate action to bar all striking employees, resident or not, from the facility grounds was concern for the prison's security and the possible misuse and destruction of state property by striking employees. Although this concern may have justified temporary dispossession of appellants from their premises without an advance hearing, the record does not show that it justified quartering State Guardsmen in those premises in alleged violation of their Third Amendment rights.
 
 
 25
 Accordingly, we affirm the dismissal of the due process claim but reverse and remand the dismissal of the Third Amendment claim for proceedings not inconsistent with this opinion.
 
 
 26
 IRVING R. KAUFMAN, Circuit Judge, concurring in part and dissenting in part:
 
 
 27
 The majority holds that Judge Robert W. Sweet improperly granted defendants' motion for summary judgment and dismissed the claim of Marianne E. Engblom and Charles E. Palmer, state correction officers, that their Third Amendment rights were violated by the quartering of New York State National Guardsmen in their residences at the Mid-Orange Correctional Facility in Warwick, New York, during a statewide strike of correction officers. Supporting this theoretical and impracticable position, which acknowledges a farfetched Third Amendment "quartering" claim based on a constitutional provision rarely, if ever, utilized, the majority conjures phantom "genuine issues of material fact." Moreover, my brethren adopt a fanciful interpretation of the meaning of "house" protected under the Third Amendment, and fail to pay sufficient heed to the special circumstances and exigencies of prison administration. I cannot agree. A careful and practical analysis, responsive to the full range of interests at stake, leads me to the conclusion that Engblom and Palmer did not have a property interest which would give them the right under the Third Amendment to exclude from their prison quarters National Guardsmen sent to the prison during the crisis conditions caused by the strike. Accordingly, in light of the patently frivolous nature of appellants' claim, I dissent from this aspect of the Court's decision.[1]
 
 
 28
 With its historical origins rooted in the English Bill of Rights of 1689, the Third Amendment of the United States Constitution[2] embodies a fundamental value the Founders of our Republic sought to insure after casting off the yoke of colonial rule: the sanctity of the home from oppressive governmental intrusion. In passing the Quartering Act of 1765, the British Parliament required the American colonists to bear the cost of feeding and sheltering British troops stationed in this country. The Act provided that if there was insufficient room for the soldiers in the barracks, they could be quartered in inns, livery stables and ale houses. 5 Geo. 3, c.33 (1765). The Quartering Act of 1774, one of the "Intolerable Acts" the British Parliament enacted as tensions heightened following the Boston Tea Party, authorized much more intrusive intervention. Apparently, before the Revolution, the City of Boston provided barracks for British troops only on an island in Boston Harbor from which the soldiers could not move quickly to the City in the event of an uprising or disturbance by the colonists. To remedy this strategic disadvantage, the Quartering Act of 1774 authorized the British commanders to quarter their troops wherever necessary, including the homes of the colonists. 14 Geo. 3, c.54 (1774).
 
 
 29
 The aversion of the populace to the military presence of the British found eloquent expression in the Declaration of Independence, which registered the complaint that the King "has kept among us, in times of peace, Standing Armies without the consent of our legislatures." When the colonies began drafting constitutions and declarations of rights during the Revolution, a prohibition against the quartering of troops in private homes was frequently articulated. For instance, section 21 of the Delaware Declaration of Rights, drafted in 1776, provided "that no soldier ought to be quartered in any house in time of peace without the consent of the owner, and in time of war in such a manner only as the Legislature shall direct."[3] Two months later, Maryland proclaimed its own Declaration of Rights, which contained an analogous clause.[4] Similar provisions appear in the Massachusetts Declaration of Rights in 1780[5] and the New Hampshire Bill of Rights in 1783.[6] After the Framers forged the Constitution, the memory of an oppressive military presence lingered among the people. Emanating from the first Congress in 1789 as part of the proposed Bill of Rights to meet the widespread popular demand for safeguards for individual rights and subsequently ratified by the States, the Third Amendment to the United States Constitution prohibited the often distrusted Federal Government from the peacetime quartering of soldiers in any house without the consent of the owner. With the help of the Fourth Amendment, the Third Amendment thus constitutionalized the maxim, "every man's home is his castle."[7] The Founding Fathers, I am certain, could not have imagined with this history that the Third Amendment could be used to prevent prison officials from affording necessary housing on their own property to those who were taking the place of striking guards.
 
 
 30
 I do not disagree with the majority that the Third Amendment should be incorporated into the Fourteenth Amendment for application to the states. The Third Amendment embraces aspects of liberty and privacy that have justified the application of the Fourth Amendment's prohibition against unreasonable searches and seizures to the states. The notion that the home is a privileged place whose privacy may not be disrupted by governmental intrusions is basic in a free and democratic society. As Judge Jerome Frank felicitously phrased it, "(a) sane, decent, civilized society must provide some such oasis, some shelter from public scrutiny, some insulated enclosure, some enclave, some inviolate place ...."[8] Accordingly, Judge Sweet properly concluded that the Third Amendment is incorporated into the Due Process Clause of the Fourteenth Amendment as one of the "fundamental" rights "rooted in the tradition and conscience of our people" and thus "implicit in the concept of ordered liberty." Griswold v. Connecticut, 381 U.S. 479, 499, 85 S.Ct. 1678, 1689, 14 L.Ed.2d 510 (1965) (Harlan, J., concurring); Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937).
 
 
 31
 Although a man's home is his castle under the Third Amendment, it is not the case, as Gertrude Stein might say, that a house is a house is a house.[9] A reasonable analysis of Engblom's and Palmer's possessory interest in their rooms at the Mid-Orange Correctional Facility, the relationship between their possession of the rooms and their employment as correction officers, and a realistic acknowledgment that the physical context of their possessory interest was a prison, support the district court's conclusion that Engblom and Palmer did not have the kind of property right that warrants protection under the Third Amendment. While technical ownership has not been deemed a prerequisite for a constitutionally protected property interest in other contexts, see e.g., Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); United States v. Agapito, 620 F.2d 324, 333-35 (2d Cir.), cert. denied, 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980), it does not follow that the Third Amendment's protection covers every conceivable type of possessory interest, from full ownership to the rights enjoyed by the casual visitor. Like the majority, I reject a literal reading of the Third Amendment, which, on its face, appears to protect only fee simple owners of houses. In this case, of course, the literal owner of the prison residences was the State, the actor responsible for ordering the quartering of the National Guardsmen. Engblom and Palmer have argued that their interest in the prison residences was a tenancy, a type of possession exclusive of all other interests including that of the landlord, except insofar as the landlord exercises his right to enter the premises to demand rent or make repairs, and to the extent the lease permits entry for other reasons. See The Statement, Inc. v. Pilgrim's Landing, Inc., 49 A.D.2d 28, 370 N.Y.S.2d 970, 975 (4th Dep't 1975). Since a lease involves "the transfer of absolute control and possession of property at an agreed rental," id., quoting Feder v. Caliguira, 8 N.Y.2d 400, 404, 208 N.Y.S.2d 970, 972, 171 N.E.2d 316, 318 (1960), Engblom and Palmer assert that their "tenancy" interest, carrying with it the right to exclude others, was sufficient to come within the ambit of the Third Amendment protection of "houses."
 
 
 32
 Although the housing facility at Mid-Orange may have been their sole residence, the occupancy rights of Engblom and Palmer, and hence their privacy interest, were much more restricted than the bundle of rights enjoyed by a lessee in a typical tenancy relationship. The guards were not lessees of ordinary private property, but were given an option to live in staff housing as employees of a highly specialized institution with a compelling interest in security, and as a result, were subject to carefully circumscribed rules and regulations. The restrictions placed on Engblom's and Palmer's use of the rooms were quite severe. In a document entitled "Facility Housing-Rules and Regulations," signed by the occupants and Superintendent Joseph C. Snow, the prison administration noted that it retained the right to inspect the premises at any time and, accordingly, had a master key to all staff rooms. Several provisions of the regulations are related to prison security. For instance, the administration prohibited the employment of inmates in cleaning individual rooms, forbade the admission of prisoners in the staff quarters for any reason, and mandated that firearms be stored in the facility arsenal rather than in the individual rooms. The Employees Manual provided that in an emergency, the Superintendent was empowered to "suspend such portions of any or all rules which might impede proper emergency action." Coupled with the unfettered right to inspect the quarters at any time, these security-related provisions support the inference that the parties intended the prison administration to have the right to enter the quarters without limitation for the purpose of maintaining prison security. While Engblom and Palmer may have had the right to exclude third parties, it does not appear that they had the right to exclude prison officials at all. If prison officials could enter Engblom's and Palmer's rooms to search for a missing prisoner, or simply to make sure that no condition existed which could threaten the security of the prison or the safety of its employees, surely it must follow that the guards could not prevent prison officials and their representatives from entering their rooms after a strike by virtually all correction guards at the facility.
 
 
 33
 Moreover, the compelling need to maintain order and discipline in the facility induced agreement to other restrictions as well. Prison officials limited occupancy rights in the facility housing to the employee and his immediate family. According to the Regulations, employees assigned quarters in the prison housing could permit overnight or longterm guests in their rooms "under no circumstances." The residents were required to keep alcohol under lock and key. These restrictions contradict appellants' claim that they enjoyed the full and exclusive possession of their premises equivalent to a landlord-tenant relationship.
 
 
 34
 The majority's effort to avoid the implications of these restrictions on the ground that the record does not reveal whether the rules were ever enforced is unavailing. The question is whether the prison administration retained the right to enter the staff housing for purposes of inspection, quartering troops, or otherwise, not whether officials had in fact entered the rooms or enforced the restrictions in the past. To accept the majority's approach would require the untenable conclusion that the prison officials "slept on their rights" because of the absence of an earlier emergency.
 
 
 35
 The totality of the facts and circumstances indicates that the provision of prison housing to a number of the correction officers was closely related to the employment of those officers. While occupancy was not a job requirement, the purpose of providing prison housing was inherently job-related: to have personnel close at hand in the event of an emergency. Accordingly, the occupancy rights of Engblom and Palmer may be deemed analogous to possession incident to employment, see Dobson Factors, Inc. v. Dattory, 80 Misc.2d 1054, 364 N.Y.S.2d 723 (Civ.Ct.1975) (occupancy rights considered possession incident to employment), which under New York law does not constitute a landlord-tenant relationship. New York Real Property Actions and Proceedings Law § 713(11) (McKin.1979). Although Engblom and Palmer were not required to accept staff housing as a condition of their employment as correction guards, and staff housing was not provided as a form of compensation for their employment, it is a fact that their occupancy rights were closely connected to the terms of their employment. Prison officials had the right to terminate occupancy if the occupant's conduct was "detrimental to the facility," a power which makes their occupancy more similar to possession incident to employment than to ordinary tenancy.
 
 
 36
 Moreover, a Department Directive dated January 29, 1976, contains a priority list for selecting housing applications. The category of facility employees "whose presence is desired near the institution" follows the categories of facility superintendents and deputy superintendents, and precedes the general catchall category of other employees, including those whose presence near the facility is not vital. As a result, it is clear that the provision of prison housing was motivated by the desire to have a certain number of personnel close at hand at all times. This sentiment was expressed in the Addendum to the Rules and Regulations, which states that "(h)ousing on facility grounds is granted for the benefit of the facility." The conclusion that the housing arrangement in this case is analogous to possession incident to employment is not contradicted by the statement in the Directive, dated March 26, 1975, that the Department would no longer issue a certification that housing is for the benefit of the employer. That statement was intended to address the tax treatment the individual employee could expect to receive concerning the fees paid for the housing, and does not concern the purpose of the facility in providing housing to an aggregate of employees, which purpose is central to an understanding of the limitations on the rights of the "tenants."
 
 
 37
 Most important, however, is the context of the housing arrangement. Engblom and Palmer are employees at a prison. The housing facilities are located on prison grounds. Like negligence, property rights do not exist in the air. The bundle of rights accompanying a possessory interest are shaped by the context. Cf. Bynes v. Toll, 512 F.2d 252, 254-55 (2d Cir. 1975) (challenge by married students at state university to residency requirement which barred children of students from living in married student suites). Accordingly, the right of Engblom and Palmer to exclude prison officials and their agents from entering the residences is limited not only by the nature of the employment relationship, but also by the context of the prison.
 
 
 38
 In a prison, security and discipline are paramount concerns of the administration. See Sostre v. McGinnis, 442 F.2d 178, 200 (2d Cir. 1971) (en banc), cert. denied, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740; 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972). The Mid-Orange Correctional Facility has a pressing need to maintain an adequate number of guards. During the statewide strike of correction officers, the facility was faced with a crisis resulting from the absence of the guards necessary for the maintenance of order and discipline. Unfamiliar with the sweat of prison life, and lacking the expertise to provide prison officials with detailed guidance concerning appropriate measures for maintaining security, courts should be reluctant to interfere in prison administration where there has been no interference with important constitutional rights, of the prisoners or the prison guards. The prison context, with its searing tensions and overriding need for discipline and security, does not support the tortured analysis of the majority. Subject to a set of restrictions unlike any accompanying the ordinary tenancy, the staff housing at Mid-Orange, a dormitory-like barracks, simply bears no resemblance to the kind of oasis of privacy our Forefathers undoubtedly envisioned when they fashioned the Third Amendment. The majority's willingness seriously to entertain a "quartering of troops" claim holds us up to derision.
 
 
 39
 Analogous Fourth Amendment doctrine compels this result. The special prison context, and the numerous restrictions on the use of the rooms, must have shaped the "expectation of privacy" shared by Engblom and Palmer. See Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Lahti v. State, 98 Misc.2d 829, 414 N.Y.S.2d 607, 609 (Ct.Cl.1979) (terms used in an instrument are indicative of parties' intent). Even if an "owner" were arguably protected by the Third Amendment, his right should be viewed as carrying the same "expectation of privacy" as the sphere of individual liberty protected by the Fourth Amendment. It is unreasonable to conclude that appellants could have a legitimate expectation that the housing would not be used in the event of a strike by correction officers. As noted above, the Employees Manual provided that in an emergency, the Superintendent was empowered to "suspend such portions of any or all rules which might impede proper emergency action." Engblom and Palmer must have known that substitute personnel would be required during a strike. Since they are employees of a prison, they may properly be charged with knowledge of the risks and limitations on their "rights" as occupants of prison housing. Accordingly, their acceptance of prison housing in light of the prison's need for an adequate number of guards at all times may be viewed as implied consent to the use of the rooms by replacements, whether National Guardsmen or other personnel, in the event of an emergency, such as the one occasioned by the strike of the prison guards themselves.
 
 
 40
 Judge Sweet properly dismissed appellants' Third Amendment claim in granting the defendants' motion for summary judgment. The "genuine issues of material fact" noted by the majority are illusory. Whether appellant Engblom's room was in fact occupied by Guardsmen is not material.[10] Even assuming that it was so occupied, Judge Sweet correctly concluded that, as a matter of law, her Third Amendment rights had not been violated. Moreover, the other "issues" mentioned by the majority-the contradiction between Superintendent Snow's affidavit and the Directive concerning the purpose of providing prison housing, and the uncertainty whether the individual decisions to allow Engblom and Palmer to live in staff housing were based on the desire to have them live near the prison-are not serious issues of material fact requiring development at trial. Since Engblom and Palmer did not present any genuine issues of material fact, Federal Rules of Civil Procedure, Rule 56, see Securities and Exchange Commission v. Research Automation Corp., 585 F.2d 31, 32 (2d Cir. 1978); Heyman v. Commerce and Indus. Insur. Co., 524 F.2d 1317, 1319 (2d Cir. 1975), and the record is adequate for the constitutional question to be decided, see Keeler v. Joy, 641 F.2d 1044, 1047 (2d Cir.) (Tenney, J., concurring), cert. denied, --- U.S. ----, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981), the district court properly granted defendants' motion for summary judgment and dismissed appellants' Third Amendment claim.
 
 
 41
 I would affirm the judgment in all respects.
 
 
 
 [1]
 The Third Amendment provides:
 "No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law."
 Aside from the lower court's opinion in this case, 522 F.Supp. 57 (S.D.N.Y.1981), there are no reported opinions involving the literal application of the Third Amendment. Several far-fetched, metaphorical applications have been urged and summarily rejected. See, e.g., Securities Investor Protection Corp. v. Executive Securities Corp., 433 F.Supp. 470, 472 n.2 (S.D.N.Y.1977) (claim that subpoena violates the Third Amendment); Jones v. United States Secretary of Defense, 346 F.Supp. 97 (D.Minn.1972) (claim by Army Reservists that a parade order violates the Third Amendment); United States v. Valenzuela, 95 F.Supp. 363, 366 (S.D.Cal.1951) (claim that "(t)he 1947 House and Rent Act ... is and always was the incubator and hatchery of swarms of bureaucrats to be quartered as storm troopers upon the people in violation of Amendment III.").
 
 
 [2]
 Appellants do not appeal from Judge Sweet's dismissal of several other claims and therefore we do not address them
 
 
 [3]
 Superintendent Snow's affidavit states that facility housing was "made available to assure a source of correctional guards so that the facility would be properly attended." Various Department of Corrections documents, however, contain contradictory pronouncements in this regard. A 1978 document states that "(h)ousing on facility grounds is granted for the benefit of the facility." However, a Department Directive dated January 29, 1976, provides that: "Employees are not required to live in Department owned housing as a condition of employment. The Department will no longer issue a certification that housing is for the benefit of the employer." Furthermore, the guidelines concerning the selection of applicants for staff housing specifically contemplates that some employees not there for the facility's benefit may be given staff housing. See p. 963 infra
 
 
 [4]
 These documents are published in their entirety in the lower court's opinion at 522 F.Supp. at 60 nn. 3 & 4
 
 
 [5]
 The documents are not entirely consistent. For instance, the Rules provide for "inspections at any time," while the Directive provides for annual inspections
 
 
 [6]
 Section 201.5 of the Employees Manual provides as follows: "Upon the occasion and for the duration of a major emergency, the Superintendent may suspend such portions of any or all rules which might impede proper emergency action."
 
 
 [7]
 The district court concluded that the deposition testimony of Deputy Superintendent Andrews and of the Guard's Commander Drew support appellants' contention that "striking resident correction officers were ordered to clear out their rooms specifically to provide quarters for the Guard." 522 F.Supp. at 63
 
 
 [8]
 The possessions of resident officers who did not return were packed by inmates supervised by Department personnel
 
 
 [9]
 Appellants' counsel informed the Court at oral argument that a post-strike hearing of some sort determined that Engblom's absence from work was in fact due to valid medical reasons. It is unclear from the record if this finding was made known to the district court during the proceedings below
 
 
 [10]
 In light of the bases of its holding, the district court did not decide, assuming a deprivation of a property right, what process would be due and whether the doctrine of public necessity justifying summary takings would apply here. Nor did the district court decide whether any or all of the defendants are protected by a qualified immunity, e.g., Woods v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), or shielded from damage liability due to the absence of any personal involvement. McKinnon v. Patterson, 568 F.2d 930 (2d Cir. 1977), cert. denied, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)
 
 
 [11]
 The Third Amendment's reference to the word "house" does not raise a problem. As defined by Webster's Third International Dictionary (1961)-a structure intended for human habitation-the term readily encompasses the various modern forms of dwelling
 
 
 [12]
 The district court cited Dobson Factors Inc. v. Dattory, 80 Misc.2d 1054, 364 N.Y.S.2d 723 (Civ.Ct.1975); Hartman v. Sykes, 66 Misc.2d 764, 322 N.Y.S.2d 158 (Civ.Ct.1971); Mayer v. Norton, 62 Misc.2d 887, 320 N.Y.S.2d 576 (Civ.Ct.1970). Interestingly, these cases all hold that possession incident to employment can coexist with a tenancy relationship; the two are not mutually exclusive
 
 
 [13]
 Thus we need not decide whether the procedural safeguards contained in the Department's regulations and state landlord-tenant laws by themselves create a substantive entitlement protected by the due process clause. The district court held they did not, citing Lake Michigan Comm. Coll., 518 F.2d 1091, 1095-96 (7th Cir. 1975), cert. denied, 427 U.S. 904, 96 S.Ct. 3189, 49 L.Ed.2d 1197 (1976); Cofone v. Manson, 594 F.2d 934, 937-38 (2d Cir. 1979)
 
 
 [14]
 We disagree with the district court's conclusion that, by striking, appellants relinquish any rights they may have had and thus were not deprived as such. As to Engblom, there was a significant factual dispute concerning whether her absence from work was due to valid medical reasons or to her alleged participation in the strike. As to both appellants, assuming that their eviction did not occur until their rooms were cleared on April 25, there is a real question whether the eviction was due to their alleged strike activity or to the decision to house Guardsmen in their rooms. See n. 7, supra. We note that appellants were never terminated from their employment. Thus, even assuming their occupancy was an incident to employment, the predicate for their occupancy never ended. In any event, it is highly dubious whether by participating in a strike they thereby relinquish all procedural rights that may be provided by state landlord-tenant law
 
 
 [15]
 Appellants suggest in their brief that their evictions may have been a penalty for their alleged participation in an illegal strike. App. Br. at p. 30
 
 
 [16]
 In addition, appellants may have an action for compensatory and/or punitive damages for wrongful eviction. Brandt v. deKosenko, 57 Misc.2d 574, 293 N.Y.S.2d 489, 490 (1968); N.Y. Real Prop. Actions and Proceedings Law § 853. Apparently this suit might not be barred by sovereign immunity if the state, in its role as a "landlord," is not performing a "government function" and is thereby deemed to have consented to be held to the standard of conduct of private landlords, e.g., Drake v. State, 97 Misc.2d 1015, 416 N.Y.S.2d 734 (1979), aff'd sub nom. Madigan v. State, 73 A.D.2d 1031, 425 N.Y.S.2d 532 (App.Div.1980), and Drake v. State, 75 A.D.2d 1017, 432 N.Y.S.2d 676 (App.Div.1980); Cosgrove v. State, 278 A.D. 596, 102 N.Y.S.2d 353, 354 (1951); or, even if considered a government function, its decision to provide housing created a "special relationship" between it and the resident officers from which an enforceable duty may arise. Poysa v. State, 102 Misc.2d 269, 423 N.Y.S.2d 617 (1979). See also Heisler v. State, 78 A.D.2d 767, 433 N.Y.S.2d 646, 648-49 (1980). Cf. Hongisto v. Mercure, 72 A.D.2d 850, 421 N.Y.S.2d 690, 693-94 (1979) (Acting Commissioner's decision concerning rehabilitation of inmates immune from local zoning ordinances)
 
 
 [1]
 I concur in the majority's affirmance of Judge Sweet's dismissal of the claim of Engblom and Palmer that the quartering of National Guardsmen in their residences at the prison without prior notice and hearing violated their rights under the Due Process clause of the Fourteenth Amendment. Even assuming the existence of a sufficient property interest, I agree that adequate post-eviction procedures were available to evaluate the propriety of the State's action. Moreover, it is hornbook law that summary actions without prior notice and a hearing may be taken by authorities in the event of an emergency or crisis. See Parratt v. Taylor, 451 U.S. 527, 539, 101 S.Ct. 1908, 1915, 68 L.Ed.2d 420 (1981). See also United States v. Caltex, 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157 (1952); Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950). It cannot responsibly be argued that a strike by all but a few correction officers at a prison with an overriding interest in security does not create an emergency and "necessit(ate) ... quick action." Parratt v. Taylor, supra, 451 U.S. at 539, 101 S.Ct. at 1915
 
 
 [2]
 The Third Amendment provides:
 No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law.
 
 
 [3]
 Laws of the State of Delaware, 1700-1797 (1797), Vol. 1, app., 79-81, reprinted in, B. Schwartz, The Bill of Rights, A Documentary History 276-78 (1971)
 
 
 [4]
 Maryland Declaration of Rights, 1776, § 28, reprinted in, B. Schwartz, supra note 3, at 280-85
 
 
 [5]
 See B. Schwartz, supra note 3, at 339-44
 
 
 [6]
 See B. Schwartz, supra note 3, at 375-79
 
 
 [7]
 This maxim has long been a guide to judicial interpretation. In 1603, Coke's Reports declared, "(t)he house of every one is to him as his castle and fortress, as well as for his defense against injury and violence, as for his repose." Semayne's Case, 5 Co. Rep. 91a, 91b (1603). See also Ker v. California, 374 U.S. 23, 47, 83 S.Ct. 1623, 1636, 10 L.Ed.2d 726 (1963) (Brennan, J., dissenting)
 
 
 [8]
 United States v. On Lee, 193 F.2d 306, 315-16 (2d Cir. 1951) (Frank, J., dissenting), aff'd, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952)
 
 
 [9]
 Cf. G. Stein, Geography and Plays: Sacred Emily (1922) ("Rose is a rose is a rose is a rose")
 
 
 [10]
 Superintendent Snow's affidavit asserts that Engblom's room was never occupied by Guardsmen, while Engblom's affidavit states the contrary